THE REMINGTON ARMS UNION METALLIC CARTRIDGE COMPANY, Plaintiff, *v.* GEORGE ATKINSON, Defendant.

(Supreme Court, New York Trial Term, May, 1919.)

Releases — when general release not a bar in an action in conversion — contracts — damages.

> Plaintiff having taken a contract from the French government for the manufacture of bayonet grips made a contract with defendant to manufacture 100,000 of them. The French government cancelled its contract with plaintiff, which in turn, after about 30,000 of the grips had been delivered, cancelled its contract with defendant, who claimed as damages, prospective profits, metals on hand and depreciation on other metals used by it outside the contract, to all of which plaintiff made no objection except as to the item of prospective profits, and its offer to .settle if that item was reduced one-half was rejected and defendant herein brought his action for damages. Plaintiff then offered to settle for $8,500 which defendant agreed to accept provided mutual general releases would be exchanged at the time of settlement. Plaintiff accepted the modification unqualifiedly, the $8,500 was paid and general releases exchanged. Upon plaintiff asking a few days later for the return of the metals defendant's attorney replied that the release of his client by the plaintiff barred its claim. In an action in conversion for the value of the metals arising out of the settlement of defendant's action for damages, *held*, that plaintiff was entitled to their possession; that the obligation to return them grew out of the negotiations looking to a settlement of the controversy between the parties, was a part thereof, and that the release from plaintiff to defendant did not bar it.
>
> Plaintiff was entitled to judgment for the market value of the metals on the date of the demand for their delivery, with interest.

ACTION in conversion arising out of a settlement of an action for breach of contract.

Shearman & Sterling, for plaintiff.

William M. Armstrong, for defendant.

FORD, J. This action arises out of a settlement made between the parties of a claim for damages on account of a breach of contract. The plaintiff claims that the terms of the settlement required the return to it of certain metals which the defendant has refused to deliver on the ground that a general release delivered to him by the plaintiff contemporaneously with its check for $8,500 " in full settlement " concluded the entire transaction.

The plaintiff had taken a contract from the French government for the manufacture of bayonet grips and contracted with the defendant for the manufacture of 100,000 of them. The French government cancelled its contract with the plaintiff which in turn cancelled its own contract with the defendant after about 30,000 of the grips had been made and delivered to the plaintiff.

In due course the defendant presented his bill for damages claimed in three items: (a) prospective profits; (b) metals on hand; and (c) depreciation on other metals used by the defendant outside the contract. Attention was called to errors in the two metal items which were voluntarily corrected by the defendant and a revised invoice sent to the plaintiff on December 14, 1916, although the invoice itself was dated December fifth. The plaintiff did not object to the metal item but insisted that the item of prospective profits should be largely reduced. In a letter of December 19, 1916, plaintiff offered to settle if that item was reduced one-half. The defendant turned the matter over to its counsel who wrote rejecting the offer, suggesting that the plaintiff make a new one and threatening suit. In January the plaintiff renewed its offer which was again rejected and suit commenced by the defendant. Then the plaintiff wrote under date of January 31, 1917, asking for a counter offer and turned

the controversy over to its attorneys who had appeared in the action.  The subsequent negotiations were had between the lawyers, who continued to discuss terms of settlement.  The defendant's counsel on March first offered to throw off $1,000 from the profits item and the plaintiff's counsel replied offering to pay $8,500 " in full settlement."

Had the defendant's acceptance of this offer been unqualified, there is no doubt that he would have been obligated to return the metals, for their delivery to the plaintiff was unquestionably contemplated in all previous negotiations, the controversy turning upon the amount of the item of prospective profits alone. The offer must have been understood in that sense by the defendant as the plaintiff certainly intended it should be.

But instead of an unqualified acceptance of plaintiff's offer, defendant's counsel replied under date of March seventeenth, accepting the offer of " $8,500 in full settlement " but adding, " *if mutual general releases can be exchanged at the same time.*"  This modification was accepted unqualifiedly by the plaintiff's attorneys, the $8,500 paid and the general releases exchanged.  When a few days later the plaintiff asked for the return of the metals, defendant's attorney curtly replied that the release of his client by the plaintiff barred its claim.  The plaintiff then commenced this action in conversion for the value of the metals.  A jury was waived and all questions of law and fact submitted to the court.

The defendant's original claim was first presented on its printed invoice form dated September 18, 1916, with an accompanying letter which stated: " You will note that we have billed to you the pure shot nickel, which we have on hand, the ingot nickel bronze mixture we have on hand and also the small amount of

bayonet grips, all of which we are holding for your disposition."

In the corrected invoice dated December 5, 1916, claim is made for loss of profits, $5,667.62; for metals on hand, $3,927.09; and for depreciation of metals retained, $611.30; total, $10,206.01. Deducting the $1,000 thrown off in the letter of March 1, 1917, leaves $9,206.01 as the lowest offer made by defendant before plaintiff's final offer of $8,500 was accepted on the condition that releases be exchanged. Plaintiff had been insisting that one-half the profits item amounting to $2,833.81 should be deducted from the bill. That is, it had offered $7,372.20, or $1,833.81 less than the lowest figure which the defendant up to this time had agreed to accept. The plaintiff's counter offer of $8,500 was an increase of $1,127.80 over the previous offer, which reduced the difference between the parties to $706.01. That the offer of $8,500 was conditional upon the return of the metals,— an item of $3,927.09 in the invoice,— is unquestionable. The defendant was asked upon cross-examination whether he understood that if he accepted that offer, he was to keep the metal and his answer was, " No, I didn't think so." Then these questions and answers followed: " Q. Well, did you tell Mr. Armstrong to accept that offer on the basis of returning the metals to the Remington Company? A. No, sir, I told him to refuse it. Q. But you decided it would be a pretty good settlement if you could keep $4000 worth of metals and also get $8500, didn't you? A. Well, it depends on how you look at it; there was not $4000 worth of metals, worth to me, I did not consider it. I didn't decide it that way. Mr. Armstrong said: ' Would you be willing to do it? ' I said: ' I certainly would.' He said: ' I will go back and make them a proposition of that kind.' "

The proposition was made in the letter of his attorney to the plaintiff's attorneys accepting the offer of $8,500 on condition that general releases be exchanged at the same time.

In the light of the invoice as presented and of the protracted controversy concerning its principal items of prospective profits throughout all of which the return of the unused metals to the plaintiff was an understood condition to be performed so soon as the amount of the invoice should be agreed upon and paid, what is the reasonable construction to be placed on the letter accepting the offer of $8,500 in full settlement " if mutual general releases can be exchanged at the same time? " Did it have the same force and effect as if it had said, " Your offer is accepted on condition that the metals are not to be returned? " I think not, whether the question is viewed as one either of fact or of law. True, the attorneys for the plaintiff did not again mention the return of the metals, but their return was at all times in contemplation of both sides from the beginning of the controversy and whenever mentioned in the negotiations they were spoken of as belonging to the plaintiff as soon as the invoice was paid. There is no such magic in the condition that releases be exchanged as can obliterate all that had gone before. Plaintiff's attorneys were warranted in assuming that the proposed condition meant no more than observance of the not unusual practice among careful lawyers of advising such exchange at the close of an important and vexatious transaction, such as the one about to be terminated. The obligation to return the metals grew out of that transaction, was a part of it and the release from the plaintiff to the defendant did not bar it. It was indeed a part of the consideration for that release. *Maloney* v. *Hudson River W. P. Co.*, 133 App. Div. 499, 501; *Wenz* v. *Meyersohn*, 59

id. 130; *Andrews* v. *Brewster,* 124 N. Y. 433, 440; *Szymanski* v. *Chapman,* 45 App. Div. 369; *Miller* v. *Schloss,* 159 id. 704, 711; revd., on other grounds, 218 N. Y. 400; *Baird* v. *Baird,* 145 id. 659, 664; *Medical Col. Laboratory* v. *New York University,* 178 id. 153, 165.

It follows that the plaintiff was entitled to the possession of the metals. The demand for their delivery as of April 20, 1917, is admitted, so there remains only to arrive at their market value about that date. The testimony is rather unsatisfactory on this phase of the case, but since I am exercising the functions of a jury I think there is enough to enable me to arrive at the damages of the plaintiff with reasonable accuracy. The value of the metals as given in defendant's invoice may not be accepted as the measure of damages for that was merely the cost price to the defendant. Furthermore, a large part of the whole mass of metals consisted of bronze mixture and bayonet grips containing four different metals in fixed proportions. This mixture does not appear to have a market value except as scrap and from my understanding of Mr. Wardle's testimony it was worth about three-fourths of the market value of its constituent metals. Since the mixture (including of course the bayonet grips made from it) contained fifty-five per cent of copper, twenty per cent of nickel, seventeen per cent of zinc, and eight per cent of tin, by taking the market value of these at the lowest prices given by plaintiff's purchasing agent and allowing the one-quarter reduction, the total scrap value of the mixture is found to be $653.69. The market value of the shot nickel at forty cents a pound was $2,454. This gives a total value of $3,107.69 for which judgment is granted to the plaintiff, with interest from April 20, 1917, and costs.

Judgment accordingly.